*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 23-CF-0701

CLEMENT AUSTIN, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2020-CF2-001768)

(Hon. Errol R. Arthur, Trial Judge)

(Submitted October 30, 2024                                  Decided September 25, 2025)

*Sean R. Day* was on the briefs for appellant.

*Matthew M. Graves*, United States Attorney at the time the brief was filed, and *Chrisellen R. Kolb*, *John P. Mannarino*, *Kathryn Bartz*, *Megan McFadden*, and *Michael C. Lee*, Assistant United States Attorneys, were on the brief for appellee.

Before EASTERLY, HOWARD, and SHANKER, *Associate Judges*.

Opinion for the court by *Associate Judge* SHANKER.

Dissenting opinion by *Associate Judge* EASTERLY at page 31.

SHANKER, *Associate Judge*: Immediately after appellant Clement Austin left his aunt's third-floor apartment—and in the wake of an argument in that apartment— five gunshots rang out from the apartment's yard. Mr. Austin's aunt, Marcia Austin,

called 911 and exclaimed into the phone, "My nephew's shooting a gun. He's in a green car. He's shooting a mother-fucking gun at my house." Minutes later, responding police officers apprehended Mr. Austin on a nearby street, and, using a car key in his possession, unlocked a blue-green car from which they recovered a pistol.

After a trial in which Ms. Austin's 911 call was admitted as evidence, a jury convicted Mr. Austin of unlawful possession of a firearm, carrying a pistol without a license outside a home or business, unlawful discharge of a firearm, possession of an unregistered firearm, and unlawful possession of ammunition. On appeal, Mr. Austin contends that the trial court erred by (1) upholding the jury's verdict despite insufficient evidence that he fired, carried, or possessed a pistol and (2) admitting Ms. Austin's 911 call into evidence through the excited utterance hearsay exception.

We are not convinced. First, ample direct and circumstantial evidence connects Mr. Austin to the shots fired in the apartment yard. Second, based on Ms. Austin's demeanor on the call and the stressful circumstances in which she made it, the trial court did not abuse its discretion in qualifying the call as an excited utterance. Contrary to Mr. Austin's argument, the fact that Ms. Austin testified that she was concerned and angry when she made the call is of little import—our focus

is not on parsing fine distinctions between related emotional states, but instead on determining whether Ms. Austin was "manifestly overcome" by her exposure to a startling event. Accordingly, we affirm.

## I. Factual and Procedural History

### A. Family Dispute

On a February 2020 evening in the District's northeast quadrant, Mr. Austin stopped by Ms. Austin's third-floor apartment. During his visit, Mr. Austin became upset and raised his voice at Ms. Austin's "company." Although the exact substance of the dispute is unclear, it appeared to involve Mr. Austin's girlfriend and cigarettes. Ms. Austin sided against Mr. Austin, and he became angry with her. He then left the apartment.

### B. Shots Fired

After Mr. Austin left, the District's "ShotSpotter" system detected five gunshots outside of Ms. Austin's apartment. Immediately thereafter, Ms. Austin

called 911. Because the contents of this call are central to this appeal, we describe them in detail.[1]

At the beginning of the recording, Ms. Austin muttered, "Come on, come on," and then loudly said "hello?" when an automated voice stated "D.C. 911." Once a live operator asked, "What's the address of the emergency?," Ms. Austin quickly relayed her address and, before the operator could speak again, exclaimed, "My nephew's shooting a gun. He's in a green car." Speaking in a loud, elevated tone, she added, "He's shooting a mother-fucking gun at my house." After this statement, she took a sharp gasp for air, suggesting that she was out of breath.

The operator asked Ms. Austin to repeat her address. Because Ms. Austin appeared not to understand (she responded, "Hello?"), the operator reiterated his request. This reiteration succeeded only in part: Ms. Austin stated her building number but did not provide her street, instead exclaiming, "You want to shoot at me, do you?"

The operator repeated Ms. Austin's building number and asked, "What street?" But instead of answering that question, Ms. Austin launched into a description of Mr. Austin ("He got black pants on, he got Timberlands on, and a

---

[1] A transcript of the call was not admitted at trial and therefore is not a part of the record on appeal. A recording of the call, however, is in the record.

black jacket."), claimed that he was "running down the street," and then emphasized that "the mother-fucking car" was parked "in front of [her] yard." As she made this last statement, her voice began to rise to a yell.

Seemingly seeking to refocus Ms. Austin, the operator said "ma'am?" but Ms. Austin continued to yell. Only when the operator resorted to a drawn out "Hello?" did Ms. Austin stop speaking to pay attention. The operator again asked Ms. Austin for her street, and she repeated the street and yelled her building number anew, initially mixing up two of the numbers.

After relaying her address, Ms. Austin said, "Yeah. Yeah. You want to shoot? You want to shoot? Yeah. Yeah. And playing that go-go? Fuck all y'all." She repeated Mr. Austin's description and reiterated that he was "running down the street." Breathing heavily, she concluded, "Fuck outta here. Cause he [inaudible] up on fucking cigarettes. Damn near take my . . . . Hello?"

The operator asked Ms. Austin for her name, and she gave it and then confirmed it upon request. The operator next asked her for her phone number, but in the middle of his question Ms. Austin exclaimed, "Yes," and terminated the call.

## C.     Officers Arrive

Notified by the ShotSpotter alert, officers reached the scene within a "couple minutes" of the shooting.  Ms. Austin ran to them yelling and, based on the information she provided during this interaction, officers apprehended Mr. Austin around the corner.  Again relying on information from Ms. Austin, officers used a set of keys found on Mr. Austin's person to unlock a blue-green car parked near Ms. Austin's apartment.  From the glovebox of the vehicle, officers recovered a firearm—a nine-millimeter pistol—loaded with two cartridges.  Officers also found five nine-millimeter shell casings on the ground outside of Ms. Austin's apartment.

Ms. Austin told the police officers that she went to the window as Mr. Austin left the house and "saw him fire a firearm into the air."  She showed the officers the window from which she saw the incident, and the officers confirmed that the shooter would have been visible from that vantage point.  Finally, she explained that Mr. Austin had stopped at his vehicle after the shooting and she pointed out the vehicle in question to the officers.

## D.     Subsequent Investigation

The government swabbed the pistol and tested the swabs for DNA.  A swab of the exterior could not be compared to a swab taken from Mr. Austin.  A swab of

the magazine, however, turned up DNA from three individuals. The government's analysis determined that "[o]btaining this [three-individual] mixture profile is approximately 1.07 trillion times more likely if the DNA originated from [Mr. Austin] and two unknown, unrelated individuals than if the DNA originated from three unknown, unrelated individuals."

The government also uncovered additional evidence after the incident. Following his arrest, Mr. Austin made a call from jail, wherein he stated, "[T]hey got my dog off me and all that shit. The car. All that shit bro." No dog besides the officers' K-9 unit was present in the car or at the scene. The parties also stipulated to the following fact: in the months following the incident, Mr. Austin "was observed driving a blue Hyundai Sonata . . . , the same car from which the gun . . . was recovered in this case."

A grand jury indicted Mr. Austin for unlawful possession of a firearm (prior conviction), carrying a pistol without a license (outside home or place of business), unlawful discharge of a firearm, possession of an unregistered firearm, and unlawful possession of ammunition. As the parties prepared for trial, the government moved in limine to admit a recording of Ms. Austin's 911 call as either an excited utterance or a present-sense impression. After hearing oral argument by the parties and

listening to a recording of the call in its entirety, the court took the issue under advisement so that it could "take a look at the cases cited by counsel."

### E.     Trial

At trial, the government called Ms. Austin as its key witness.  Her trial testimony, however, differed from her 911 call and her other post-incident statements.  Ms. Austin testified that after Mr. Austin left the apartment, she "wasn't looking outside" but heard gunshots.  According to Ms. Austin, she called the police "right after," and, as she was making the call, looked out the window and saw Mr. Austin walking "slow[ly] towards the next building."  In this telling, Ms. Austin did not see who fired the gun.

The government asked Ms. Austin to explain how she felt about coming to court, to which Ms. Austin replied, "I feel sick to my stomach."  Asked to elaborate, Ms. Austin stated that her "nephew is a good guy" who had "never done anything to harm [her]," and that she "spoke too fast," "reacted too fast," and "made a mess out of it."  Ms. Austin also noted that she had spoken to Mr. Austin about the incident, that she knew he denied his guilt, and that she was present to testify only because she "would get locked up if [she] didn't come."

The government sought to admit Ms. Austin's 911 call as substantive evidence—i.e., to prove that Ms. Austin saw Mr. Austin fire a weapon—pursuant to the excited utterance exception to the rule against hearsay. It took the government several attempts to lay a foundation sufficient to convince the trial court to admit the call. But after Ms. Austin testified that she (1) made the call right after she heard gunshots, (2) felt angry because of a prior shooting involving her son, (3) found the risk of bullets flying to be "scary," and (4) called the police because she "wanted it to stop," the trial court admitted the call as an excited utterance, over Mr. Austin's objection (and notwithstanding Ms. Austin's acknowledgement that she had been "high" at the time). The trial court explained that Ms. Austin "used the words that it was scary" and "referenced that her son had been shot" and therefore she was "under the stress of the triggering event," which was the hearing of sounds "that she believed to be gunshots." The prosecution then played the 911 call before the jury.

Subsequently, when Ms. Austin continued to deny having seen Mr. Austin fire a gun or approach his car, the prosecution impeached Ms. Austin by playing body-camera footage from her interview following the incident. After watching the video, Ms. Austin admitted she told police officers that she saw Mr. Austin shoot a gun.

The jury convicted Mr. Austin on all counts, and this appeal followed.

## II.    Analysis

We first address Mr. Austin's argument that the evidence was insufficient to support his convictions.  Then, we turn to Mr. Austin's contention that the trial court erroneously admitted Ms. Austin's 911 call.  We find no grounds for reversal.

### A.    Sufficiency of the Evidence

We begin with Mr. Austin's contention that the evidence was insufficient to prove his guilt beyond a reasonable doubt.  Mr. Austin contends that no reasonable jury could have convicted him of (1) carrying the gun, (2) firing the shots, or (3) possessing the gun and/or its ammunition.  Given the abundance of both circumstantial and direct evidence indicating that Mr. Austin indeed fired five shots that winter evening, we disagree.

"When reviewing a challenge to the sufficiency of the evidence, we examine that evidence in the light most favorable to sustaining the verdict," *Jones v. United States*, 716 A.2d 160, 162 (D.C. 1998), and "consider all the evidence admitted at trial, including the evidence appellant claims should have been excluded, regardless of whether the court erred in admitting it."  *In re T.B.*, 331 A.3d 242, 248 (D.C. 2025) (citation modified).  We will "reverse a conviction for insufficiency only if there is no evidence from which a reasonable mind might find the defendant guilty

beyond a reasonable doubt." *Id.* We emphasize, however, that this requirement is not toothless: we review sufficiency determinations de novo, *Wicks v. United States*, 226 A.3d 743, 746 (D.C. 2020), and "there must be [more than] some relevant evidence in the record in support of each essential element of the charged offense[s]," *Rivas v. United States*, 783 A.2d 125, 134 (D.C. 2001) (en banc).

To resolve Mr. Austin's sufficiency challenge, we need only conclude that there was sufficient evidence that Mr. Austin unlawfully discharged the weapon— i.e., that he intentionally fired the gun within the District of Columbia and without a permit to do so. *See* D.C. Code § 22-4503.01. This is true because if Mr. Austin indeed intentionally discharged the weapon, he necessarily "carried" it, "possessed" it, and "possessed" the ammunition within it. *See* D.C. Code § 22-4504(a)(2) (carrying a pistol without a license); *id.* § 22-4503(a)(1), (b)(1) (unlawful possession of a firearm); *id.* § 7-2506.01(a)(3) (unlawful possession of ammunition); *see also* *White v. United States*, 714 A.2d 115, 119 (D.C. 1998) (noting that a conviction for carrying a pistol without a license requires the pistol to have been "convenient of access and within reach" of the defendant (citation modified)); *Rivas*, 783 A.2d at 129 (stating that a defendant can possess an item by, among other avenues, (1) knowing about the presence of the item and (2) having "both the ability and the intent to exercise dominion or control over it").

We conclude that a reasonable jury could have found that Mr. Austin fired the pistol at issue in this case. Five shots were fired outside of Ms. Austin's apartment immediately after Mr. Austin left the apartment and following an argument in which he was involved. A pistol matching the caliber of the fired bullets was found in a nearby car that Mr. Austin was known to drive and to which Mr. Austin had the key. DNA testing revealed a high likelihood that Mr. Austin's DNA was present in or on the pistol's magazine—i.e., where the gun is loaded. And because no dog besides a K-9 unit was present when Mr. Austin was apprehended, jurors could reasonably infer that when, during a jail call, Mr. Austin referred to police officers getting his "dog," he was talking about his gun—the pistol recovered at the scene.

Finally, the jury could reasonably infer from Ms. Austin's 911 call that she saw Mr. Austin fire the shots and then approach the car in which the gun was found, as she exclaimed, "He's in a green car . . . shooting a . . . gun at my house."

Mr. Austin's four counterarguments do not alter our conclusion. First, he suggests that no direct evidence establishes that he fired the gun. But even assuming Ms. Austin's 911 call does not constitute direct evidence, "we draw no distinction between direct and circumstantial evidence," as "circumstantial evidence may be more compelling than direct testimony." *Wright v. United States*, 926 A.2d 1151, 1152-53 (D.C. 2007) (citation modified).

Second, Mr. Austin calls Ms. Austin an unreliable witness. This complaint, however, need not detain us long: "this court is not in a position to substitute its judgment for that of the fact-finder when it comes to assessing the credibility of a witness." *Robinson v. United States*, 928 A.2d 717, 727 (D.C. 2007).

Third, Mr. Austin seeks to discount the presence of his DNA on the gun's magazine, relying on out-of-jurisdiction cases that have held fingerprint evidence alone insufficient to prove possession. *See, e.g.*, *United States v. Townley*, 942 F.2d 1324, 1325-26 (8th Cir. 1991). The DNA evidence connecting Mr. Austin to the gun's magazine, however, is but one of multiple pieces of evidence that link him to the five gunshots fired that night. The cases he cites, therefore, do not advance his cause.

Finally, Mr. Austin argues that there was "no evidence of who placed the gun in the vehicle." But because the key that officers used to unlock the vehicle was recovered from Mr. Austin—and because Ms. Austin's 911 call and trial testimony connected Mr. Austin to the vehicle at the time of the shooting—the jury could reasonably infer that Mr. Austin stashed the weapon therein before leaving the scene. *See Hooks v. United States*, 191 A.3d 1141, 1143-44 (D.C. 2018) (concluding that evidence was sufficient to support conviction for carrying a pistol without a license

where officers never saw the defendant with a gun, but instead heard him drop something into a dumpster from which they recovered a revolver).

Based on the above, we are convinced that the government presented sufficient evidence to convict Mr. Austin. *See Rivas*, 783 A.2d at 128.

## B.     Excited Utterance

Mr. Austin's next argument implicates the "excited utterance" doctrine. Our common-law evidence jurisprudence bars parties from admitting hearsay—i.e., "an out-of-court statement offered to prove the truth of the matter asserted"—at trial. *Dutch v. United States*, 997 A.2d 685, 688 (D.C. 2010). This hearsay bar, however, is subject to numerous exceptions, one of which—the "excited utterance" exception—allows a party to admit a hearsay statement if the declarant made the statement while "manifestly overcome" with emotion stemming from an exciting event. *Mayhand v. United States*, 127 A.3d 1198, 1202 (D.C. 2015). This exception rests on the idea that "mental stress and nervous strain preclude deliberation and bar reflection," thereby providing a safeguard against fabrication. *Odemns v. United States*, 901 A.2d 770, 777 & n.6 (D.C. 2006) (citation modified).

To admit a statement as an excited utterance, the trial court bears "the legal responsibility to examine the testimony" and confirm that three elements are satisfied. *Mayhand*, 127 A.3d at 1205 (citation modified). These elements are:

> (1) the presence of a serious occurrence which causes a state of nervous excitement or physical shock in the declarant, (2) a declaration made within a reasonably short period of time after the occurrence so as to assure that the declarant has not reflected upon his statement or premeditated or constructed it, and (3) the presence of circumstances that in their totality suggest spontaneity and sincerity of the remark.

*Gabramadhin v. United States*, 137 A.3d 178, 183 (D.C. 2016) (citation modified). "[T]he ultimate question is whether the statement was the result of reflective thought or whether it was rather a spontaneous reaction to the exciting event."[2] *Mayhand*, 127 A.3d at 1205 (citation modified).

We review the trial court's answer to the question for abuse of discretion and its factual findings for clear error. *Id.* When evaluating the trial court's exercise of discretion, we consider, among other factors not necessary to set forth here, whether

---

[2] We note also that the proponent of an excited utterance must demonstrate "the declarant's personal knowledge of the [described] event." *Simmons v. United States*, 945 A.2d 1183, 1188 (D.C. 2008) (citation modified); *see also id.* ("An anonymous speaker's comment about a shooting cannot be found to have been an excited utterance without evidence that the unknown declarant witnessed the shooting." (citation modified)). Because Mr. Austin has not raised the issue of Ms. Austin's personal knowledge on appeal, we do not address it here.

(1) the record reveals sufficient facts upon which the trial court's determination was based and (2) the outcome reached by the trial court was within the range of permissible alternatives. *See (Markus) Johnson v. United States*, 960 A.2d 281, 295 (D.C. 2008); *In re P.M.B.*, 293 A.3d 1103, 1109 (D.C. 2023). The latter factor requires us, in light of the applicable legal standard and the facts elicited at trial, to assess "whether the decision maker failed to consider a relevant factor, whether he relied on an improper factor, and whether the reasons given reasonably support the conclusion." *(Markus) Johnson*, 960 A.2d at 295 (citation modified).

Abuse-of-discretion review is "deferential in attitude." *(James) Johnson v. United States*, 398 A.2d 354, 362 (D.C. 1979). We defer to trial courts' evidentiary rulings because we recognize that trial courts exercise "on-the-spot judgment" in the heat of trial, with access to information such as witness demeanor that escapes review on the cold appellate record. *See In re Orshanksy*, 804 A.2d 1077, 1092 (D.C. 2002). This on-the-spot immediacy brings with it time pressure; accordingly, we have recognized that it is often infeasible for trial judges to amass a detailed record and enumerate each reason underlying their decisions. *See (Markus) Johnson*, 960 A.2d at 295. Where rulings made in the heat of trial are concerned, therefore, we may ourselves "examine the record and infer the reasoning upon which the trial court made its determination." *Id* (citation modified); *see also Peoples v. Warfield & Sanford, Inc.*, 660 A.2d 397, 403 (D.C. 1995) ("Generally speaking, a

trial court's failure to explain a particular exercise of discretion is not necessarily fatal to appellate review if a valid reason can be discerned for the court's action." (citation modified)). And we will not lightly infer that a trial court misapplied the law when making an evidentiary ruling—to the contrary, we presume, in line with our more general presumption that trial courts "know and apply the proper legal standards," *Saxon v. Zirkle*, 97 A.3d 568, 573 (D.C. 2014) (citation modified), that the trial court "applied the law of evidence correctly unless the record shows to the contrary," *King v. United States*, 51 A.3d 512, 519 (D.C. 2012). Indeed, trial court rulings as a whole "come to us with a presumption of correctness." *In re C.T.*, 724 A.2d 590, 597 (D.C. 1999).

Mr. Austin contends that the government laid an insufficient foundation to admit Ms. Austin's 911 call pursuant to the excited utterance doctrine. Specifically, Mr. Austin suggests that "being 'scared,'" concerned, or angry, "without more, fails to qualify a statement as an excited utterance." In his view, the government was required to elicit testimony from Ms. Austin that she was incapable of ordinary cognitive function. But this focus on Ms. Austin's trial testimony in isolation is incorrect. The correct focus is on the totality of the circumstances as reflected in the record before the trial court, and here, we conclude that that record amply supports the trial court's ruling. To explain why this is so, we step through each factor of the excited-utterance analysis.

### 1.     Nervous excitement or physical shock

The first prong of the analysis has two parts.  We first ask whether the trial court could reasonably have found that Ms. Austin experienced a "serious occurrence" or "exciting event." *Mayhand*, 127 A.3d at 1205-06 (citation modified).  If the answer to that question is yes, we then ask whether the trial court could have reasonably found that the event placed Ms. Austin into a "state of nervous excitement or physical shock." *Id.* (citation modified).  Both must be true for a purported excited utterance to avoid the hearsay bar.  *See id.*

Part one gives us little pause.  Our precedent demonstrates that close proximity to guns or gunfire—particularly in the context of an ongoing dispute—constitutes a serious occurrence.  *See Simmons*, 945 A.2d at 1187-88 (affirming the admission of statements where declarant witnessed a nearby shooting); *United States v. Woodfolk*, 656 A.2d 1145, 1147, 1151 (D.C. 1995) (affirming the admission of statements where declarant was scared of her boyfriend because he owned a gun and would not let her leave).  And here, Ms. Austin perceived the event as involving Mr. Austin shooting at her house.  Regardless of whether Ms. Austin saw Mr. Austin fire shots into the air or merely heard those shots after her argument with Mr. Austin, we are satisfied that the trial court could reasonably deem the gunshots to have constituted a "serious occurrence" or an "exciting event."

Turning to part two, the record supports the trial court's determination that after she heard the gunshots, Ms. Austin suffered from a state of nervous excitement sufficient to preclude reflection. We reach this conclusion in large part due to Ms. Austin's demeanor on the 911 call itself—specifically, her raised voice, her apparent inability to focus on the operator's questions, and her decision to terminate the call in the middle of her conversation with the operator.[3]

We begin with Ms. Austin's urgent tone of voice. From the beginning of the call, Ms. Austin is frantic—one can hear her repeating "come on, come on." Her voice is elevated throughout, eventually rising to a yell. And one can hear what sounds like strained, heavy breathing by Ms. Austin. All of the above is consistent

---

[3] We note as an initial matter that the fact that Ms. Austin had the wherewithal to call 911 does not weigh categorically against the admission of her statement as an excited utterance—the cases in which we have affirmed the admission of 911 call recordings under this exception are numerous. *See, e.g.*, *Parker v. United States*, 249 A.3d 388, 405-06 (D.C. 2021); *Andrade v. United States*, 106 A.3d 386, 394 n.3 (D.C. 2015); *Goodwine v. United States*, 990 A.2d 965, 967 (D.C. 2010); *Teasley v. United States*, 899 A.2d 124, 128-29 (D.C. 2006); *Malloy v. United States*, 797 A.2d 687, 690 (D.C. 2002); *Woodfolk*, 656 A.2d at 1150-51. Nor does the fact that Ms. Austin answered some operator questions necessarily cut against a conclusion that an utterance was excited. *See Reyes v. United States*, 933 A.2d 785, 791 (D.C. 2007) ("[R]esponses to preliminary investigative questions, made while the declarant is still under the spell of the startling event, may qualify as spontaneous utterances because the questions are asked to ascertain the nature of the emergency and do not provide an opportunity for the declarant to reflect on the event or to premeditate a response."); *Lewis v. United States*, 938 A.2d 771, 776 (D.C. 2007) ("The fact that a victim made the statement in response to a question is not proof that he reflected before speaking." (citation modified)).

with a state of nervous excitement. *See Woodfolk*, 656 A.2d at 1151 (referencing the "sense of urgency" in the declarant's "tone" when affirming the admission of her statement as an excited utterance); *Goodwine*, 990 A.2d at 966-67 (admitting excited utterance based in part on the declarant's "fast," "elevated" tone).

Next, we note the rambling, out-of-control structure of Ms. Austin's statements—particularly, her struggle to focus and repeated resort to expletives. Rather than provide her full address as requested, Ms. Austin turned her comments to an absent Mr. Austin: "You want to shoot at me, do you? Yeah, yeah, yeah." The operator asked again for her address, but Ms. Austin (initially) ignored him, instead launching unprompted into a description of Mr. Austin and an angry reference to Mr. Austin's "mother-fucking car."[4] Finally, Ms. Austin exclaimed (apparently at Mr. Austin, albeit from inside the apartment): "You want to shoot? You want to shoot? Yeah. Yeah. And playing that go-go? Fuck all y'all." We have repeatedly found these features of a statement—difficulty responding to questions, muttering, use of expletives, and unprompted exclamations—to be indicative of a state of nervous excitement.[5]

---

[4] At one point, the operator resorted to a drawn-out "hello" to get Ms. Austin to interrupt her narrative and pay attention to him.

[5] *See Teasley*, 899 A.2d at 129 (admitting 911 call as excited utterance where victim "mumbled to himself," had trouble recalling his car's license plate number,

Third, and finally, Ms. Austin hung up the call after only one minute and thirty-five seconds, even though the operator was still trying to ask her questions. We have recognized that "lengthier statements" such as "call[s] last[ing] for roughly twelve minutes" are less likely to qualify as excited utterances. *Gabramadhin*, 137 A.3d at 183. It follows that shorter statements, ended abruptly, are more likely to pass the excited utterance threshold.

The above features of the recording leave us with the distinct impression that the trial court's decision to admit the call as an excited utterance both was supported by sufficient record facts and fell with the range of permissible determinations. And Ms. Austin's trial testimony cements that conclusion. Ms. Austin explained that she had suffered a prior, traumatic experience with gun violence—her son was shot and sustained wounds that paralyzed him and that eventually led to his death. She also explained that she found the fact that bullets were flying to be "scary." These statements provide important context for why Ms. Austin presented as overwhelmed

and also uncharacteristically used profanity); *Lewis v. United States*, 938 A.2d 771, 774-75 (D.C. 2007) (admitting statement as excited utterance where victim struggled to answer police questions and instead blurted out what happened to her); *Simmons*, 945 A.2d at 1187-90 (admitting statement as excited utterance where declarant "mumbl[ed] to himself," did "not offer a detailed narrative of a past event," and "blurted out his concerns . . . to a total stranger who had only asked him if he was 'okay'").

on the 911 recording—they suggest, as the trial court found, that she was reliving a traumatic experience.[6]

And still other statements suggest that Ms. Austin was not capable of reflection in the moments after she heard the gunshots. Ms. Austin testified that, in hindsight, she felt that she "spoke too fast," "reacted too fast," and "made a mess out of it." This testimony suggests that, had Ms. Austin been capable of reflecting, she would not have called 911 at all.[7] Thus, we see no issue with the trial court's partial reliance on Ms. Austin's testimony in support of its decision to admit the call.

In arguing to the contrary, Mr. Austin focuses on Ms. Austin's trial testimony in isolation from the recording to which it relates, asserting that feeling "scared,"

---

[6] Our dissenting colleague argues that because Ms. Austin said that gunfire was scary "[e]ven though you're used [to it]," she cannot have been overwhelmed by her reaction to hearing gunshots. We are not convinced that the trial court was required to find that Ms. Austin's unspecified exposure to gun violence canceled out other evidence that she was distraught. It is clear from the record, for instance, that Ms. Austin's previous exposure to gunfire did not block out her memory of the traumatic injury and death of her son.

[7] The dissent engages in some mental gymnastics in reading Ms. Austin's testimony as an admission that she had "wrongly accused her nephew of being the person who fired the shots that she heard." *Post* at 65. Ms. Austin's statements at trial, read in context, clearly reflect regret that her actions caused her nephew legal trouble.

"angry," or "concerned" is not the same as being in a state of nervous excitement.[8]

We agree with Mr. Austin to the extent he contends that mere "proof of emotional disturbance is insufficient" unless it is paired with evidence that "the individual's powers of reflection have been suspended." *Parker*, 249 A.3d at 405 (citation modified). But we disagree that the trial court had before it only evidence of emotional disturbance—instead, we think that the combination of Ms. Austin's testimony and her demeanor on the call allowed the trial court to reasonably conclude that Ms. Austin's powers of reflection had been suspended.

We also reject Mr. Austin's invitation to draw fine distinctions between related emotional states. Different victims of trauma may manifest their shock in different ways; where one person bursts into tears, another might erupt into anger. What matters is not what specific, excitement-adjacent emotion a declarant manifests, but instead whether the declarant was "overcome" by their reaction to the triggering event.[9] *See Mayhand*, 127 A.3d at 1206. So, Ms. Austin's testimony that

---

[8] Mr. Austin also flags Ms. Austin's admission that she was high on heroin, Xanax, and methadone at the time of the gunshots. This fact, however, is of little import; an excited-utterance declarant's "intoxication affects only the weight [given] the[ir] [statement], not its admissibility." *Lewis*, 938 A.2d at 776 (holding that the appellant's argument that the declarant was intoxicated provided "no basis for reversal" of the trial court's admission of the declarant's statement as an excited utterance).

[9] Contrary to the dissent's suggestion, *post* at 55 n.11, we are not asserting that "near-excitement" or something short of excitement can suffice for admission

she felt "angry," for instance, does not carve her statement out of the excited utterance exception's reach. *See Parker*, 249 A.3d at 406 (admitting statement of "angry" declarant as excited utterance); *Goodwine*, 990 A.2d at 967 (same); *Teasley*, 899 A.2d at 127 (same).[10]  Instead, that testimony, when viewed alongside the recording, provides additional support for the conclusion that Ms. Austin was manifestly overcome by her reaction to the gunshots.

Considering the totality of the circumstances, we see no abuse of discretion in the trial court's determination that Ms. Austin was in a state of nervous excitement at the time of the call.

### 2.     Contemporaneity and spontaneity

To be admitted as an excited utterance, a statement must have been made "within a reasonably short period of time after the occurrence, so as to ensure that the declarant had not had time to reflect on the statement or premeditate or construct it." *Mayhand*, 127 A.3d at 1208 (citation modified).  Mr. Austin appears to concede

---

of an excited utterance.  Our point is that excitement can manifest differently and a declarant's failure to use the word "excitement" in testimony describing their emotional state is not fatal to application of the exception.

[10] Although an angry person, *if capable of reflection*, might be more likely to make vindictive, false accusations than a calm person, anger is also probative of haste, excitement, and an inability to reflect.  Which way anger cuts depends on the facts of the particular case; here, we think Ms. Austin's testimony that she was angry cuts in favor of the admission of her statement.

this "contemporaneity" element, and for good reason. Ms. Austin testified she called 911 "right after" she heard gunshots. And we need not look long to identify cases in which we have held that later-made statements nevertheless qualified as excited utterances. *E.g.*, *Parker*, 249 A.3d at 405 (admitting 911 call made approximately fifteen minutes after the inciting incident as an excited utterance).

### 3. The totality of the circumstances

The third and final element requires us to determine "whether the circumstances . . . in their totality" support the "spontaneity and sincerity of the remark." *Mayhand*, 127 A.3d at 1211 (internal quotations omitted and alteration in original). Given our analysis above—and the absence of evidence that Ms. Austin's statements were manufactured or insincere—we are convinced that this element does not render the trial court's ruling an abuse of discretion. Accordingly, we affirm the trial court's classification of the call as an excited utterance.

### 4. The dissent

Our dissenting colleague disagrees that the trial court's ruling fell within the range of permissible outcomes based on the facts in the record; we rest on our above analysis with respect to that contention. But the dissent also raises two other critiques that merit further response. First, the dissent contends that the trial court

misapplied the legal standard at trial because it stated only that Ms. Austin was "under the stress of the triggering event," an error that, if it occurred, would mandate reversal. Second, the dissent suggests that, by considering record evidence on which, in its view, the trial court did not rely, we are engaging in de novo review rather than reviewing for abuse of discretion. Neither critique withstands scrutiny.

The dissent's first claim ignores our longstanding presumption that trial courts apply "the law of evidence correctly unless the record shows to the contrary." *King*, 51 A.3d 512, 519 (D.C. 2012). This presumption allows us, for instance, to affirm a trial court's evidentiary ruling even where the trial court articulated no legal standard at all. *See Randolph v. United States*, 882 A.2d 210, 220 (D.C. 2005) (finding no abuse of discretion with respect to the following ruling by the trial court: "No, no, no prior consistent statement!"). This is so because, to rebut this presumption, an appellant must point to an affirmative indication in the record suggesting that the trial court misunderstood the applicable standard. *See In re D.N.*, 65 A.3d 88, 95-96 (D.C. 2013).

We do not think that the trial court's statement that Ms. Austin was "under the stress of the triggering event" qualifies as an affirmative indication that it misapplied the law. Instead, we view the trial court's statement as presenting a shorthand for— and not an alternative to—the full test. This view of the trial court's ruling is

appropriate based both on the presumption of correctness and on our recognition that trial courts issue oral rulings in the heat of trial. *See In re R.M.G.*, 454 A.2d 776, 790 (D.C. 1982) ("We have noted . . . that the exigencies of trial sometimes do not permit much elaboration in support of a discretionary ruling."). We note also that (1) the correct legal standard was presented in full to the trial court via motion-in-limine briefing; and (2) the trial court stated at the motion-in-limine hearing that it had reviewed a number of excited-utterance cases and would view additional cases cited by the parties. For all of these reasons, we do not consider Mr. Austin to have rebutted the presumption that the trial court knew and applied the correct legal standard.

The dissent's second critique—its contention that we rely on record evidence that the trial court discounted—rests on a mistaken premise. The dissent reads the trial court to have affirmatively declined to consider Ms. Austin's recorded statement and instead to have relied solely on Ms. Austin's testimony regarding her emotional state. Yet the record reveals no such decision by the trial court; indeed, it demonstrates the opposite. When the government argued at trial that the court should consider Ms. Austin's demeanor on the 911 call in combination with Ms. Austin's trial testimony regarding her emotional state, the trial court responded, "Okay." We find it puzzling that the dissent interprets the trial court's *assent* to the

government's suggestion that it consider the recording as a *rejection* of that suggestion.

In support of its contrary view, the dissent first points out that if the trial court had deemed the recording alone as having provided a sufficient foundation for admission, it could have granted the government's motion in limine. The dissent "[p]resum[es]" that the trial court did not grant the motion in limine before trial because "Ms. Austin called 911 with the obvious purpose of accusing her nephew of a crime so that the police would apprehend him, eagerly reporting details about his appearance and location, in addition to answering the 911 operator's questions."[11] *Post* at 33. The trial court, however, did not base its decision to defer ruling on the motion on the contents of the call. Instead, it declined to issue a pretrial ruling expressly because it (1) wanted to "take a look at the cases cited by counsel" and (2) wanted to wait and see whether Ms. Austin would testify. Such deferral of evidentiary rulings until trial is common and cannot be read as an implicit pretrial denial of the motion for admission. In any event, we are not suggesting that the trial court deemed the recording alone sufficient—instead, we conclude that the trial

---

[11] We are not sure about the "obvious" purpose of Ms. Austin's call, but generally the purpose of a 911 call is to report a crime and, where possible, identify the perpetrator. The excited utterance inquiry focuses not on that purpose—after all, 911 calls can and do qualify as excited utterances—but on whether the statements on such a call are reliable because the declarant was manifestly overcome with emotion.

court admitted Ms. Austin's statement based on *both* the recording *and* Ms. Austin's trial testimony regarding her emotional state.

Second, the dissent notes that the trial court stated that its ultimate ruling was "based on [Ms. Austin's] testimony." The dissent reads this statement as establishing that the trial court relied *only* on Ms. Austin's testimony—put differently, it adds by inference the word "solely" into the trial court's ruling. But we know that the trial court listened to the recording before trial. And given the trial court's earlier assent to the prosecution's suggestion that it consider the recording, we do not believe that the dissent's inference is justified. Instead, we read the trial court as having found that Ms. Austin's testimony regarding her fear and her prior traumatic experiences with gun violence was the last piece in the totality-of-the-circumstances analysis that pushed the statement over, in the trial court's words, the "threshold" for admission. It strains credulity to think that a trial court would admit a recording as an excited utterance in reliance solely on post-hoc testimony about the recording, *without considering the contents of the recording at all*—and this is all the more so where, as here, the trial court listened to the recording, the government specifically asked the court to consider the recording in addition to the testimony, and the court said "okay."

Finally, the dissent suggests that the trial court might have interpreted the recording differently than we do. But the trial court ultimately ruled that the statement was admissible, and we do not think it distorts the boundaries of abuse-of-discretion review to infer that the trial court's view of the recording was in line with its ultimate conclusion. After all, when reviewing a midtrial ruling like the one here, we may infer the trial court's reasoning from its context and from the evidence in the record. *See (Markus) Johnson*, 960 A.2d at 295.

Abuse-of-discretion review is deferential in part because deference "promotes the value of finality"; we do not "indulge in close scrutiny of the minutiae surrounding the trial court's exercise of judgment" because we recognize that discretionary decisions are, "in essence," "imprecise judgment[s]." *(James) Johnson*, 398 A.2d at 362-63. The trial court exercised its discretion here to admit Ms. Austin's statement. We see no abuse in that determination.

### III. Conclusion

We conclude that, based on the 911 call and other evidence strongly suggesting that Mr. Austin fired a weapon outside Ms. Austin's home, a reasonable jury could have found Mr. Austin guilty of the charged offenses. And given Ms. Austin's demeanor on her 911 call, the stressful circumstances in which she made it, and her testimony regarding her emotional state, we find no abuse of

discretion in the trial court's decision to admit the call as an excited utterance. Accordingly, we affirm Mr. Austin's convictions.

*So ordered.*

EASTERLY, *Associate Judge*, dissenting in part: After the District's ShotSpotter system detected shots fired outside of Marcia Austin's apartment one evening in February 2020, Ms. Austin—who, as the government concedes, only heard the shots—called 911 to report that her nephew, Clement Austin, was the shooter. Prior to trial, the government tried to get a ruling that this hearsay statement was admissible as an excited utterance (or a present sense impression) by playing the recording of the call for the judge. But this recording, which can be heard here, gives no indication that Ms. Austin's "powers of reflection [were] suspended" because she was "manifestly overcome by excitement or in shock," as is required under our case law to render a presumptively unreliable statement admissible under the exception to the rule against hearsay for an excited utterance.[1] *Mayhand v.*

---

[1] As can be heard on the recording, Ms. Austin had the following exchange with the 911 operator (the timestamps are in parentheses):

Ms. Austin:  Come on, come on.  (0:00-0:01)

Operator:    DC 911 (0:01-0:02)

Ms. Austin:  Hello? (0:00-0:04)

Operator: What's the address of your emergency? (0:04-0:06)

Ms. Austin: 5804 Foote Street. My nephew's shooting a gun. He's in a green car. [Pause] He's shooting a motherfucking gun at my house. (0:06-0:17)

Operator: Okay, ma'am, repeat the address. (0:17-0:19)

Ms. Austin: Hello? (0:19-0:2)]

Operator: Ma'am, repeat the address. (0:20-0:21)

Ms. Austin: 5804. You wanna shoot at me, do you? Yeah, yeah, yeah, yeah. (0:21-0:30)

Operator: (speaking at the same time as Ms. Austin): 5804. What street? (0:25-28)

Ms. Austin: He got black pants on. He got Timberlands on and a black jacket. And he's running down the street, and the motherfucking car is parked in front of my yard . . . . (0:30-41)

Operator: Ma'am. Hellooo? (0:40-0:42)

Ms. Austin: Yes. Hello. Hello. (0:42-0:45)

Operator: 5804. What street? (0:43-0:45)

Ms. Austin: Foote Street. Fifty-Oh, 5804 Foote Street. Yeah, yeah. You wanna shoot? You wanna shoot? Yeah, yeah. And playing that go-go? Fuck all y'all. Yeah, he run down the street. He got beige Timberlands on, black pants, and a black coat. Get the fuck out of here. [indiscernible] fucking cigarettes. [indiscernible] Hello? (0:45-1:20)

Operator: What's your name, ma'am? (1:20-1:21)

Ms. Austin: My name is Marcia Austin. (1:22-1:25)

Operator: Marcia Austin. (1:25-1:27)

*United States*, 127 A.3d 1198, 1202, 1207 (D.C. 2015). Ms. Austin called 911 with the obvious purpose of accusing her nephew of a crime so that the police would apprehend him, eagerly reporting details about his appearance and location, in addition to answering the 911 operator's questions. Presumably for that reason, the trial court did not grant the government's motion at that time.

The government subsequently tried to lay a foundation for the admission of the call while Ms. Austin was on the stand at trial. But it repeatedly came up short because Ms. Austin failed to testify that, as a result of hearing the gunshots, she was in the requisite emotional state necessary for an excited utterance. Instead, consistent with how she sounds on the recording of her 911 call, she explained she was "angry" and "high." *Infra* Part I.B&C. The court rightly refused to admit the call based on this testimony. The court only capitulated to the government's repeated requests to put the call into evidence after Ms. Austin agreed with the prosecutor's framing that she was "concerned" at the time of the call; acknowledged that hearing

---

Ms. Austin: Yes. (1:27-1:28)

Operator: Ms. Austin, what's your phone number? (1:28-1:30)

Ms. Austin: Yes. (1:29-1:30)

Operator: Ms. Austin, what's your phone number? (1:32-1:34)

Call ends.

gunfire is "scary[,] [e]ven though you're used [to it]"; and explained that she hates guns because her son had been shot at some point in the past. *Infra* Part I.D&E. But none of these statements, singly or collectively, comes anywhere close to showing that Ms. Austin's powers of reflection were suspended by a stressful event when she was speaking to the 911 operator, as was required for her statements to have been properly admitted as excited utterances.

The trial court thus abused its discretion in admitting the 911 call into evidence based on Ms. Austin's testimony. And the majority—which affirms only by ignoring the trial court's flawed rationale for its ruling, substituting its own reasoning, and focusing "in large part," *ante* at 19, on the recording of the call—distorts both our abuse of discretion review and our rule against the admission of hearsay.

## I.      Facts and Procedural History

Because Ms. Austin's 911 call so obviously did not qualify as an excited utterance, it took the government five tries before the trial court finally ruled (incorrectly) that the government's showing was good enough to allow the call to be admitted into evidence.

## A.    The First Try

Prior to trial, the government moved for permission to admit into evidence Ms. Austin's 911 call under exceptions to the rule against hearsay for excited utterances and present sense impressions.  The court heard argument on the motion at a pretrial hearing.   The government played the recording of the call and highlighted that Ms. Austin was speaking in the present tense and was in "an excited [and] agitated state."  In opposition to the motion, defense counsel noted, relying on the timing of the ShotSpotter activation, that the call occurred minutes after the shots had been fired, so her statements could not be present sense impressions.  Counsel further noted that Ms. Austin had had the time to reflect and "wasn't under the excitement of the situation" when she spoke to the 911 operator, as counsel noted was required for the excited utterance exception under this court's case law, citing *Gabramadhin v. United States*, 137 A.3d 178 (D.C. 2016).  Instead, counsel argued, Ms. Austin "made those statements out of determination, not out of spontaneity," and her tone and strong language simply showed that "she[ was] upset," and there was "determination behind . . . what she [was] upset by."

Had the court concluded that the recording of the call, and Ms. Austin's vocal "demeanor" in particular, *ante* at 2, 19, so clearly established that her statements to the 911 operator were excited utterances, it could have granted the government's

motion then. But it did not. After finding that no gunshots were audible, the court observed that it heard Ms. Austin "saying that he's out here . . . [s]hooting at my house. My nephew is shooting a gun" and then her "express[ing] her feelings about what he's alleged to have done." The court "t[ook] this issue under advisement," stating that it wanted to "look at the cases cited by counsel" and take a "deeper dive into this issue."

## B.    The Second Try

The government did not yet have a ruling on its motion in limine when it called Ms. Austin to the stand at Mr. Austin's trial and sought to admit the 911 call. The government elicited testimony from Ms. Austin that, after her nephew left her apartment one evening, she heard a "bang bang" that "sounded like a gun"; she then called the police; and, at the time of her call, she felt "angry" because her "son got shot with a gun at 17, and he died years later, so [she] hate[d] guns." At this point, the government renewed its pretrial motion to admit Ms. Austin's 911 call into evidence as either an excited utterance or a present sense impression.

The government asserted that "[t]he call, in some way, speaks for itself," but also argued that "Ms. Austin testified to being in a heightened emotional state at [the] time she made the call." The defense highlighted that Ms. Austin had testified that "she was angry"—"not afraid"—when she made the call and argued that a

statement "fueled" by anger is not an excited utterance. Observing that Ms. Austin's "testimony, as it stands right now, is that [when] she placed the call, she was angry," the court concluded that the government had failed to lay a foundation for the call's admission.

## C.   The Third Try

In its continued direct examination, the government elicited testimony from Ms. Austin that she made the call "[r]ight after" she heard the "bang bang" sound. The government also asked if Ms. Austin was feeling any other feelings besides anger when she made the call, to which she responded, "I was high."[2]

The government, then, again moved to admit the 911 call, now solely as a present sense impression. The court again ruled that the government had failed to lay the requisite foundation for either hearsay exception it had invoked, observing that Ms. Austin had testified that (1) she had made the call after hearing the shots, and (2) "she made the call because she was angry" and "she was high" at the time of the call.

---

[2] Later, on cross-examination, Ms. Austin admitted that she was using heroin, Xanax, and methadone the night she made the 911 call. She also reiterated that she was angry when she made the call.

### D.    The Fourth Try

Resuming direct, the government asked Ms. Austin whether she thought the shooting was still ongoing when she called 911.  She responded: "No, I didn't think—I know—I know what I thought I heard and I called the police."  When asked whether she was "concerned about what was happening" when she made the call, Ms. Austin responded, "Yeah."  When asked what, if anything else, she was feeling when she made the call besides "concerned and angry," she said, "That's it."  Ms. Austin also confirmed that she could not see Mr. Austin either when she heard the shots or when she was talking to the 911 operator.

The government then again moved to admit Ms. Austin's 911 call into evidence, arguing that her testimony that "she was still concerned about what was going on when she made the call" supported its admission as either a present sense impression or an excited utterance.  But the court again denied the government's motion.  The court explained that the call could not be a present sense impression because Ms. Austin had testified that "she made the call while she was in the house and she was not at the window," so the court did not "believe that . . . she[ was] describing the events as she saw them."  And addressing whether Ms. Austin was "under the stress of [a] triggering[] or startling event" necessary for an excited utterance, the court concluded that the evidence established only "that she was angry,

that she was high, and that she was concerned." Although the government argued that the court should take into account the recording of the call and the "tone Ms. Austin used," the court, after acknowledging both parties' points about the audio of the 911 call with repeated "okay[s]," indicated it was not persuaded that the call was admissible as an excited utterance. Focusing on Ms. Austin's testimony about her mental state, the court again observed that, "if it's just that she was concerned, she was angry, and she was high," it did not believe the call "would qualify" for admission under this hearsay exception. Nevertheless, acknowledging that Ms. Austin's statements to the 911 operator were important to the government's case, the court allowed the government to "probe further" to find out "why she used the word concerned" to describe "how she felt."

### E. The Fifth Try

Following the court's guidance, the government asked Ms. Austin "what [she was] feeling concerned about" when she called 911. Ms. Austin responded that "bullets [were] flying." When asked to elaborate, she said, "It's scary. It's scary. Even though you're used [to it],[3] it's still scary." The government followed up, "What was scary about the situation to you?" Ms. Austin answered, "Just thinking

---

[3] The court reporter appears to have mis-transcribed Ms. Austin's testimony as: "Even though you're used it to."

somebody out there shooting." The government asked whether Ms. Austin was "concerned that somebody was still out there shooting," but Ms. Austin responded, "No. Because it stopped." The government and Ms. Austin then had the following exchange:

| | |
|---|---|
| Prosecutor: | Okay. So why did you make the call to 9-1-1 that night? |
| Ms. Austin: | Because I thought it was my nephew because he was angry. Even if it—you know, even if I didn't think it was him, you know, somebody out there was shooting. |
| Prosecutor: | Okay. So you said earlier that you were concerned. Can you tell me more about what you were concerned about? |
| Ms. Austin: | Okay. I'll repeat that again. My son got shot at the age of 17. And I hate guns. He was paralyzed for many years and complications due to the gunshot he passed. So, I hate guns. |
| Prosecutor: | Okay. So based on that experience, how do guns make you feel? |
| Ms. Austin: | I don't like guns. |
| Prosecutor: | Okay. And how did the sound of gunshots on February 9, 2020, make you feel? |
| Ms. Austin: | I called the police because I wanted it to stop. |

Prosecutor:        Why did you want it to stop?

Ms. Austin:       Because I don't like guns.

For the fifth time, the government moved to introduce the 911 call into evidence.

Over the defense's continued objection, this time the court ruled for the government, specifically relying on Ms. Austin's testimony. The court explained:

> I do find that this qualifies [as an excited utterance], *based on her testimony and her responses [to] questions regarding her concern*. She went [o]n[]to describe what she meant by her concern. She described that once she heard what she thought were gunshots, when she heard the bang-bang, she says[,] she used the words that it was scary. She referenced that her son had been shot. So I do find here that, those statements made shortly after she hears the sounds that those—and she's described what she was feeling at the time, I do find that she was—that she was, *based on her testimony here*, under the stress of the triggering event which was the hearing of the sounds in which she believed to be gunshots. I do, *based on—I make this determination based on her testimony as to what she was feeling at the time*. I do find here that it does—the Government has met its—the threshold in establishing that this is or was an excited utterance.

(emphasis added). The government then played the full 911 call for the jury.

## II.    Analysis

"Hearsay evidence, the in-court testimony of an out-of-court statement offered to prove the truth of the matter asserted, is generally not admissible at trial." *Laumer*

*v. United States*, 409 A.2d 190, 194 (D.C. 1979). We exclude hearsay statements because "they lack the conventional indicia of reliability"; among other things, "they are usually not made under oath or other circumstances that impress the speaker with the solemnity of his statements." *Id.* (quoting *Chambers v. Mississippi*, 410 U.S. 284, 298 (1973)).

The exception at issue in this case, for excited utterances, has a "limited scope." *Mayhand*, 127 A.3d at 1201. As the majority opinion acknowledges, the proponent of the exception must show:

> (1) the presence of a serious occurrence which causes a state of nervous excitement or physical shock in the declarant, (2) a declaration made within a reasonably short period of time after the occurrence so as to assure that the declarant has not reflected upon his statement or premeditated or constructed it, and (3) the presence of circumstances [that] in their totality suggest spontaneity and sincerity of the remark.

*Ante* at 15 (alteration in original) (quoting *Gabramadhin*, 137 A.3d at 183). We reaffirmed in *Mayhand* that each element of this test must be satisfied, explaining that for the first element, "'rote recitations that the declarant was upset or excited or afraid'" are insufficient and that a declarant must be "manifestly overcome by excitement or in shock" such that their "powers of reflection [are] suspended"; for the second element, "the contemporaneousness of the statement with the exciting

event and the related 'critical requirement of spontaneity' must be given equal and careful consideration"; and for the third element, "the totality of the circumstances must be scrutinized for indicia of self-awareness and reflection that are inconsistent with the 'immediate and uncontrolled domination of the senses' necessary to establish an excited utterance." *Mayhand*, 127 A.3d at 1202, 1207 (quoting *Odemns v. United States*, 901 A.2d 770, 777-78 (D.C. 2006)). We likewise reaffirmed in *Mayhand* that a formulaic application of this three-part test will not suffice; rather, "[i]n all cases the ultimate question is whether the statement was the result of reflective thought or whether it was rather a spontaneous reaction to the exciting event." *Id.* at 1205 (quoting *In re L.L.*, 974 A.2d 859, 865 (D.C. 2009)).

When examining a trial court's application of this exception, "we review the trial court's fact-finding for clear error, and . . . the court's determination that these facts permit admission of a statement under the excited utterance exception for abuse of discretion." *Id.* at 1205. The trial court in this case—I think correctly, but at the very least reasonably—declined to rely on the recording of Ms. Austin's 911 call as a foundation for concluding that she was manifestly overcome by excitement or in shock when speaking with the operator. Instead, as detailed above, the trial court entirely relied on Ms. Austin's trial testimony about how she was feeling when she made the call to deem it admissible under the excited utterance exception. This testimony did not demonstrate, however, that her powers of reflection were

suspended when she called 911. Thus, under our abuse of discretion review, we should reverse. *See infra* Part II.B&C.[4]

The majority reaches a different conclusion, but only by reinventing the trial court's ruling. The majority asserts that the trial court did not (despite its express statements) rely solely on Ms. Austin's testimony but instead also relied on the recording of the 911 call. As a factual matter, this is wrong and, as a legal matter, it distorts our abuse of discretion review. *See infra* Part II.A.

**A. Preface: The Trial Court's Reasoning for its Discretionary Ruling**

"The essence of [discretionary] decision-making is the trial court's judgment in exercising that discretion." *Randolph v. United States*, 882 A.2d 210, 219 (D.C. 2005) (first alteration in original) (quoting *Wright v. United States*, 508 A.2d 915, 919 (D.C. 1986)). And "the parties . . . are entitled to have the trial judge exercise that discretion [so long as it is] unfettered by erroneous legal thinking . . .; they need not settle for the substituted judgment of an appellate court that would sustain the

---

[4] I discuss below only the first and third requirements of the test for excited utterances because Mr. Austin did not argue at trial or in his brief to this court that the second element—requiring that the proffered statements be made "within a reasonably short period of time after" the event that caused the declarant's powers of reflection to be suspended "so as to assure that the declarant has not reflected upon his statement or premeditated or constructed it," *Mayhand*, 127 A.3d at 1205 (quoting *Odemns*, 901 A.2d at 776)—was unsupported on this record. *See supra* Part I.B-E.

ruling on a plausible, alternative ground without benefit of all the data, derived from perceptions at trial, that inherently go into a discretionary ruling." *Id*. (quoting *Wright*, 508 A.2d at 919-20); *see also (James) Johnson v. United States*, 398 A.2d 354, 362 (D.C. 1979) (acknowledging that "[t]he concept of 'exercise of discretion' is a review-restraining one"). Thus, in assessing whether a trial court "exercise[d] its discretion erroneously," we do not employ de novo review; instead, we determine whether the trial court's decision was based on the correct legal framework and "whether [its] reasoning [thereunder] is substantial and supports the trial court's action." *(James) Johnson*, 398 A.2d at 365; *see also id*. (explaining that in abuse of discretion review we "determine 'whether the decision maker failed to consider a relevant factor, whether he relied upon an improper factor, and whether the reasons given reasonably support the conclusion'" (quoting Note, Perfecting the Partnership: Structuring the Judicial Control of Administrative Determinations of Questions of Law, 31 Vand. L. Rev. 91, 93-94 (1978))). We are not supposed to "render [our] own decision of what judgment is most wise under the circumstances presented." *In re Orshansky*, 804 A.2d 1077, 1092 (D.C. 2002) (quoting *(James) Johnson*, 398 A.2d at 362).

Here, we know exactly why the trial court ruled the way it did because the court put its reasoning on the record. *See supra* Part I.E. After holding a pretrial hearing and then entertaining four attempts by the government to admit the 911 call

as an excited utterance at trial, the court announced its ruling that a "foundation has been laid." *Id.* It then repeatedly stated that this determination was "based on [Ms. Austin's] testimony" and explained why that testimony justified its ruling. *Id.* We are bound to review that ruling and to reverse it if it constitutes an abuse of the trial court's discretion, as in fact it does. *See infra* Part II.B.

In an apparent attempt to sidestep the limitations on our powers of review and seek out additional support for the trial court's ruling in the form of evidence upon which the court did not rely—the recording of the 911 call—the majority observes that there are times where courts exercise "on-the-spot judgment in the heat of trial" and cannot "enumerate each reason underlying their decisions"; the majority then asserts that in such circumstances we may "examine the record and infer the reasoning upon which the trial court made its determination." *Ante* at 16 (quoting *(Markus) Johnson*, 960 A.2d at 295). For three reasons, the majority's rationale for disregarding the court's actual ruling and trying to substitute its own justification for admission of the 911 call as an excited utterance does not bear scrutiny.

First, the trial court's excited utterance ruling was not the product of a quick or unexplained decision. As detailed above, the court considered the admissibility of the 911 call over an extended period of time, both before and at trial, spanning fifty-two pages of transcript. *See supra* Part I. Although the court listened to the

911 call at the motions hearing, it did not rule on the motion at that time and said it wanted to think more about the matter. It subsequently declined to find that the statements on the call were excited utterances three additional times at trial, before finally concluding (wrongly) that the government had elicited sufficient testimony from Ms. Austin to support the 911 call's admission. *See id.* Absent from this ruling is any mention of the audio of the 911 call, much less any findings akin to those made by the majority about Ms. Austin's vocal demeanor on the recording, or about what could be gleaned about her state of mind from that recording. *See ante* at 4-5, 19-20. Thus, on this record, where the court explained the basis for its ruling, there is no room to infer that the trial court also relied on evidence it said nothing about.[5]

Second and relatedly, the majority omits critical language from the cases it quotes for its proposition that we can liberally infer additional bases for a trial court's ruling. What these cases actually say is that, in certain circumstances, when the court provides little or no reason for a discretionary decision, we may examine the record to see if we can discern the court's basis for that decision: They acknowledge that we may "*[i]f necessary*, . . . examine the record and infer *the* reasoning upon which the trial court made its determination." *(Markus) Johnson*, 960 A.2d at 295

---

[5] Because both parties claimed the 911 recording supported their arguments, *see infra*, one might infer, however, that the court either did not think the recording supported admission of Ms. Austin's statements or at least was undecided about which party the recording favored, and hence relied on her testimony instead.

(emphasis added) (quoting *(James) Johnson*, 398 A.2d at 366).[6] That is because "trial judges often have to make [discretionary] decisions during trial where they are 'confronted with situations that do not admit the amassing of a record and *the enumeration of reasons* upon which a structured review must depend.'" *Id.* (emphasis added) (quoting *(James) Johnson*, 398 A.2d at 365). But where, as here, the trial court gives its explanation, we have never said that, on appeal, we can graft on additional reasons the trial court did not provide, and might have rejected, to repair or replace a faulty exercise of judgment.[7] To the contrary, we have said explicitly that we "may not affirm a discretionary ruling on a ground the trial court did not rely on and had discretion to reject." *In re L.C.*, 92 A.3d 290, 297 (D.C. 2014).

---

[6] We phrased this caveat slightly differently in *(James) Johnson*: "*If needs be*, [we] may examine the record and infer *the reasoning* upon which the trial court made its determination." 398 A.2d at 366 (emphasis added).

[7] The majority cites no decision from this court that has used the record in the way the majority does to supplement and largely displace the trial court's explicitly stated reasoning for its ruling. *(Markus) Johnson* certainly is no such case. There, we identified the trial court's explanation for its ruling precluding proffered evidence under a Federal Rule of Evidence 403(b)-type analysis—namely, that the proffered evidence was "of minimal probative value" and "all it did was engender sympathy for the defendant"—and then looked to the record to determine whether those reasons had record support. 960 A.2d at 296; *see also id.* at 292, 296-97. We did not, as the majority does here, use the record to infer what the trial court's rationale was, or to add on to the court's express reasons for its ruling.

Third, the majority's discussion about its purported ability to draw inferences from the record about additional bases for the trial court's ruling seems superfluous, given its assertion that the trial court explicitly "assent[ed]" to the government's argument that it "should consider Ms. Austin's demeanor on the 911 call in combination with her trial testimony." *Ante* at 27-28; *see also id*. at 29. The majority looks to an exchange between the government and the court during the government's fourth attempt to get the 911 call admitted into evidence, after the court had denied that attempt. *See supra* Part I.D. Specifically, the majority misinterprets an "okay" from the court acknowledging the government's continued argument as a sign of agreement with the government about how to interpret the recording of the call. *Ante* at 29. This is an unreasonable understanding of the transcript, which reads as follows:

| | |
|---|---|
| The Court: | You know, Government, you can probe further about what she used—why she used the word concerned to describe—what she means when she uses the word concerned in describing her—in describing, sort of, how she felt. Okay? |
| [Prosecutor]: | Sure. I'm happy to do that. |
| | I just want to raise one additional point, Your Honor. |
| The Court: | Uh-huh. |

| [Prosecutor]: | And Your Honor has heard the 9-1-1 call and you've heard the tone that Ms. Austin used when she made that phone call. *So in addition to the testimony that we've elicited from Ms. Austin, I do think Your Honor's own review of the 911 call and the tone of Ms. Austin's voice when she made that call is relevant to the determination here.* |
|---|---|
| The Court: | *Okay.* |
| [Defense]: | And I also think that Ms. Austin's testimony that she was angry also— and Your Honor can also take that into account when evaluating this call which has multiple cuss words and has elevated tone in the voice. |
| The Court: | Okay. So, [Government], I'll allow you to clarify what she means by concerned. I don't believe that based—if it's just that she was concerned, she was angry, and she was high, I don't believe that falls within— that it would qualify as an excited utterance. Okay. |

(emphasis added). As evidenced by transcript, it is obvious that the court used the word "okay" to acknowledge the prosecutor's (and defense counsel's) statements, nothing more. In fact, the court used the word "okay" multiple times in that way.[8]

---

[8] For example, during the government's first try to get the 911 call into evidence, the court responded "okay" to the defense's arguments that the 911 call could not come in either as a present sense impression or as an excited utterance.

The court's use of the word "okay" in response to the government thus cannot reasonably be read to mean, "Yes, I agree with everything you just said."

But even if we were to read the word "okay" the majority's way as communicating "assent," all the court assented to was the government's statement that the recording of the 911 call was "relevant" to the court's decision.[9] *See supra.* The defense never disputed this. To the contrary, it argued that the recording favored Mr. Austin because it established that Ms. Austin was merely angry (a point which the court also acknowledged with an "okay"). *See id.* In short, there is no possible interpretation of this exchange that the court agreed that Ms. Austin's 911 call was admissible because of what the court had heard in the recording.

---

But, demonstrating that neither "okay" constituted a ruling for the defense, the court said it would take this issue under advisement. Similarly, on the government's fourth try to get the 911 call into evidence after eliciting additional testimony from Ms. Austin, the government "again . . . asked to move in the 911 call," prompting the court to respond "okay" before it held another bench conference at which it denied the government's request. And on the government's fifth, and successful, try, the court responded "okay" to defense counsel's arguments, right before rejecting them and granting the government's motion to admit the 911 call as an excited utterance.

[9] The evidentiary concept of relevance does not signify that evidence is influential much less dispositive; it only means that "evidence . . . has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Ransom v. United States*, 322 A.3d 521, 527 (D.C. 2024).

In sum, the trial court said it relied on Ms. Austin's testimony to conclude that her 911 call was admissible as an excited utterance, and under our abuse of discretion review, we must examine that discretionary ruling and decide if Ms. Austin's testimony reasonably supported it. As discussed below, Ms. Austin's testimony did not provide the requisite support for the trial court's ruling.

### B.      Nervous Excitement or Physical Shock

The first requirement of an excited utterance is that the declarant, as a result of a stressing event, be in "a state of nervous excitement or physical shock." *Odemns*, 901 A.2d at 776 (quoting *Nicholson v. United States*, 368 A.2d 561, 564 (D.C. 1977)); *accord Alston v. United States*, 462 A.2d 1122, 1126 (D.C. 1983). Evidence that the declarant experienced any strong emotion will not do; the record must establish that the declarant was "manifestly overcome by excitement or in shock" so as to "'preclude deliberation and bar reflection.'" *Mayhand*, 127 A.3d at 1202, 1206 (quoting *Odemns*, 901 A.2d at 778 n.6); *see also id.* at 1207 (requiring that the "individual's powers of reflection have been suspended"); *Alston v. United States*, 462 A.2d at 1126-27 (explaining that the declarant must be in a "state of nervous excitement or physical shock" and cannot have "reflected upon his statement or premeditated or constructed it" (quoting *Nicholson*, 368 A.2d at 564)).

We require proof of such a mental state because "[t]he essential rationale of [the excited utterance] exception is that statements made while a person is overcome by excitement or in shock are fundamentally trustworthy." *Mayhand*, 127 A.3d at 1206. The rationale is that:

> mental stress and nervous strain preclude deliberation and bar reflection. Declarations made while the spell endures are uncontrolled. *They are practically reflex actions and may be said to be verbal photographs or images of the contents of the brain.* Such utterances are likely to be made without any calculation as to their potential effect and without regard to their possible consequences.

*Id.* (emphasis in original) (quoting *Odemns*, 901 A.2d at 778 n.6); *see also Alston*, 462 A.2d at 1126 ("Since this utterance is made under the immediate and uncontrolled domination of the senses, and during the brief period when considerations of self-interest could not have been brought fully to bear by reasoned reflection, the utterance may be taken as particularly trustworthy.") (quoting *Beausoliel v. United States*, 107 F.2d 292, 294 (D.C. Cir. 1939)).

I assume that the trial court understood that it had to find that Ms. Austin was "overcome by excitement or in shock" so as to "'preclude deliberation and bar reflection'" when she heard gunfire outside of her apartment, *Mayhand*, 127 A.3d at 1202, 1206 (quoting *Odemns*, 901 A.2d at 778 n.6), even though the court only loosely referred to Ms. Austin being "under the stress of the triggering event which

was the hearing of the sounds . . . which she believed to be gunshots." But the trial testimony the court cited to support its determination that Ms. Austin's powers of reflection had been suspended—Ms. Austin's "reference[]" to the fact that "her son had been shot," her acknowledgement that she felt "concern[ed]" when she made the 911 call, and her testimony that hearing gunfire "was scary"—fell far short of fulfilling this criterion.

Ms. Austin's reference to her son being shot years earlier[10] was coupled—not with a description or indication of any overwhelming stress from hearing the sound of gunfire—but an explanation that that she felt "angry" because her son had been shot at a young age, "so [she] hate[d] guns." Indeed, when she was asked, "[W]hat if anything else, other than concerned and angry, were you feeling at the time," she responded, "That's it." And although Ms. Austin subsequently allowed that hearing gunfire was "scary," she immediately added, "[e]ven though you're used [to it]." Mere statements that a person was concerned or scared are not sufficient to show that they were "overcome by excitement or in shock," so as to "preclude deliberation and bar reflection." *Mayhand*, 127 A.3d at 1206 (quoting *Odemns*, 901 A.2d at 778 n.6); *see also Castillo v. United States*, 75 A.3d 157, 163 (D.C. 2013) (explaining that "'[r]ote recitations that the declarant was upset or excited or afraid' as a result

---

[10] Ms. Austin explained her son was seventeen at the time he was shot, and "he died years later."

of a startling event will not, by themselves, meet the requirements of an excited utterance").[11]  Further, by testifying that she was "used to" gunfire, Ms. Austin admitted that any fear she felt was not overwhelming.  This became obvious when the government followed up by asking her to say "more about what [she was] concerned about," and Ms. Austin, instead of providing any evidence that she was overcome by emotion despite the government's best efforts to elicit such testimony, only reiterated her strong hatred of guns.[12]

---

[11] The majority at one point suggests that the excited utterance exception may be satisfied where the declarant experiences "excitement-adjacent emotion." *Ante* at 23.  This is wrong.  As the title of this hearsay exception indicates, the declarant must actually experience "nervous excitement or physical shock," not just near-excitement, and an expansion of this exception to reach "excitement-adjacent," *id.*, reactions cannot be reconciled with binding precedent. *See Mayhand*, 127 A.3d at 1202, 1206.

Certainly, different people react to traumatic experiences in different ways. Some will not experience the requisite state of nervous excitement or physical shock. Statements made by these individuals are not admissible under the excited utterance exception.

[12] As detailed above, *see supra* I.E., the government asked her to say "more about what [she was] concerned about."  Ms. Austin responded, "Okay.  I'll repeat that again.  My son got shot at the age of 17.  And I hate guns.  He was paralyzed for many years and complications due to the gunshot he passed.  So, I hate guns." The government followed up with, "Okay.  So based on that experience, how do guns make you feel?"  Ms. Austin responded, "I don't like guns."  The government tried again to get Ms. Austin to describe "how . . . the sound of gunshots . . . ma[d]e [her] feel."  Ms. Austin responded, "I called the police because I wanted it to stop." The government asked her why.  Ms. Austin responded, "Because I don't like guns."

This should be the end of the analysis and ought to compel a conclusion that the trial court abused its discretion by allowing Ms. Austin's call to 911 to come into evidence as an excited utterance based on her trial testimony. *See (James) Johnson*, 398 A.2d at 365 (explaining that discretionary rulings must be based on "reasoning [that] . . . supports the trial court's action"); *see also Ibn-Tamas v. United States*, 407 A.2d 626, 635 (D.C. 1979) (explaining that, where the trial court's own reasoning is not sufficient, "the very reason for [our] deference[,] i.e. the trial court's opportunity to observe, hear, and otherwise evaluate the witness[,] will be compromised"). "Ordinarily, we may not salvage an unsound discretionary ruling by substituting our own reasons for those of the trial court." *Ford v. Chartone, Inc.*, 908 A.2d 72, 85 (D.C. 2006); *accord In re L.C.*, 92 A.3d at 297 ("[T]his court may not affirm a discretionary ruling on a ground the trial court did not rely on and had discretion to reject."). The sole exception to this rule is if we conclude that, considering all of the relevant facts under the correct discretionary framework, no reasonable jurist could have reached a different conclusion. *See Benn v. United States*, 978 A.2d 1257, 1277 (D.C. 2009) (acknowledging that we may affirm even where a trial court fails to exercise its discretion properly if the court, "as a matter of law, had 'but one option'" (quoting *Ibn-Tamas*, 407 A.2d at 635)).

The majority ignores this case law and does not seek to rely on this limited basis for affirming on an alternate ground when conducting abuse of discretion

review. It cannot. The alternate ground on which the majority relies is the recording of the 911 call made after Ms. Austin heard the gunshots.[13] The majority describes how Ms. Austin sounds on the call and from there attributes feelings to Ms. Austin that she never discussed in her trial testimony. I question the accuracy of these descriptors. But, in any event, quite obviously, the trial court could have heard the call differently—and seemingly did, else it could have granted the government's motion on that basis prior to trial or mentioned the recording when explaining its ultimate ruling at trial. At the very least, a different assessment of the recording of the call is reasonable, so, because the trial court did not rely on it, we cannot look to this audio to save the trial court's discretionary ruling.

The majority ascribes an "urgent tone" to Ms. Austin and states that her initial "come on, come on" statements made before the 911 operator came on the line demonstrate that she was "frantic." *Ante* at 19. There is no question that Ms. Austin sounds eager to speak to the 911 operator, but her "come on, come on" statements could be reasonably interpreted as nothing more than impatience. The majority highlights Ms. Austin's "elevated" tone that "eventually r[o]se to a yell." *Id*. A

---

[13] The majority appears to assume in this part of its analysis that Ms. Austin's state of mind at the time of the call is dispositive, but the relevant time period for this element of the excited utterance exception is at the time Ms. Austin heard the gunfire, "not at the time [s]he called 911." *Pelzer v. United States*, 166 A.3d 956, 962 n.10 (D.C. 2017).

reasonable listener might not hear any increase in volume throughout the call (in fact, I do not), but in any event, Ms. Austin said at trial that she was angry, an emotion the majority itself detects in her recorded statements. *Id.* at 22. The majority also references "what sounds like strained, heavy breathing," but a reasonable listener might not hear any such thing (I do not). *Id.* at 21. The majority refers to what it describes as "the rambling, out-of-control structure of Ms. Austin's statements," "her struggle to focus[,] and [her] repeated resort to expletives." *Id.* at 20. Here, the record speaks for itself. Ms. Austin gave the operator her name and address.[14] *See supra* note 1. In addition, she coherently volunteered a wealth of information that she seemingly understood would be helpful to the police: a description of a crime (a shooting), identification of the perpetrator (her nephew), a description of the perpetrator (black jacket, black pants, beige Timberland boots), location of the perpetrator (on her street), and description of the perpetrator's vehicle (green car). *Id*. The fact that she did not wait for the operator to ask for this information can readily be interpreted as evidence of her determination to get her nephew arrested; it does not evince a level of emotional upset such that Ms. Austin's

---

[14] Ms. Austin never ignored a request for her "full address." *Ante* at 20. Upon the first request for "the address of your emergency," she gave her street address (5804 Foote Street) and then launched into reporting a crime—the purpose of her call. *Supra* note 1. Apparently because the operator could not hear her, the operator requested the address again, at which point Ms. Austin repeated the house number. *Id.* She later gave the operator her house number a third time, along with her street name. *Id.*

powers of reflection were suspended, and certainly does not do so as a matter of law.[15] *See Mayhand*, 127 A.3d at 1211 (concluding that the declarant's call to 911 was not an excited utterance in light of the fact that he had "had the wherewithal to call the police, not merely to ask for help but to document [the defendant's] criminal behavior and to identify him to the police").

Nor can the majority save the trial court's ruling by looking to Ms. Austin's sidebars not directed to the 911 operator—"You want to shoot at me do you?  Yeah, yeah, yeah, yeah" and "Yeah, yeah.  You want to shoot?  You want to shoot?  Yeah, yeah.  And playing that go go.  Fuck all y'all." *Supra* note 1.  First, the record does not support a determination that these statements themselves are "rambling[s]," *ante* at 20, unrelated to Ms. Austin's effort to report a crime.  Rather, as the trial court found, they were "expressi[ons of] her feelings about what [her nephew was] alleged

---

[15] In addition to its content, the majority highlights the short duration of the call (because Ms. Austin hung up) and observes that, since we have recognized that "lengthier statements" are "less likely to qualify as excited utterances, . . . [i]t follows that shorter statements . . . are more likely to pass the excited utterance threshold." *Ante* at 21.  To be sure, if a declarant's powers of reflection were suspended, we are more skeptical with the passage of time that the state of shock will persist. *See, e.g.*, *Mayhand*, 127 A.3d at 1210 & n.16.  Here, however, Mr. Austin's argument is not that Ms. Austin was initially in the requisite state of excitement but then regained control of her mental faculties before she called 911. *See supra* note 4.  Rather, his argument is that Ms. Austin was never in the requisite mental state of excitement.  The fact that her call was short does not rebut this argument because it does not make it more likely that the sounds of gunshots put Ms. Austin in a state of nervous excitement or physical shock in the first place.

to have done." *Supra* Part I.A. Second, these sidebars do not prove that the whole of Ms. Austin's statements to the 911 operator were excited utterances; even if these sidebars could have been excited exclamations, her statements reporting a crime and inculpating her nephew—the only statements of value to the government—could have been (and seemingly were) the product of reflection. *See Pelzer*, 166 A.3d at 963-64 (although speaker briefly lost his composure while speaking to the 911 operator, his reflective statements describing the crime and the perpetrator's appearance were not admissible as excited utterances).

The cases the majority cites fail to support its de novo conclusion, based "in large part" on the recording of the 911 call, that "Ms. Austin suffered from a state of nervous excitement." *Ante* at 19-20; *see also id.* at 19-24. All are distinguishable on a variety of grounds, either legally[16] or factually.[17] Saliently, none of these cases

---

[16] *See United States v. Woodfolk*, 656 A.2d 1145, 1150-51 (D.C. 1995) (considering only whether there was sufficient evidence that an exciting event had occurred, not whether declarant's powers of reflection were overcome by that event); *Lewis v. United States*, 938 A.2d 771, 775 (D.C. 2007) (noting that appellant had conceded that the first element of the test for an excited utterance had been satisfied).

[17] *See Teasley v. United States*, 899 A.2d 124, 126-29 (D.C. 2006) (affirming the trial court's discretionary determinations that a 911 call was an excited utterance because the declarant, who had been carjacked at gunpoint and told the 911 operator he was "scared as hell," "didn't 'have the wherewithal' to provide his license plate number" initially and that a subsequent call to his children's grandmother was an excited utterance because she testified that he sounded excited and spoke in an "uncharacteristic" manner); *Simmons v. United States*, 945 A.2d 1183, 1187, 1190 (D.C. 2008) (affirming the trial court's discretionary determination that proffered

(1) involve a declarant who was a mere earwitness to gunshots (instead, the declarants were all victims of or eyewitnesses to extreme violence), (2) contain record testimony from the declarant about how they actually felt at the time they made the statement in question, or (3) include an admission from the declarant that their primary emotion was anger—an emotion not known to correlate with trustworthiness. *See Mayhand*, 127 A.3d at 1211 (noting that the declarant's "apparent anger" at the defendant undermined the conclusion that the statement was an excited utterance).[18]

---

statement was an excited utterance where declarant, who observed the defendant shoot someone in the back of the head, "blurted out his concerns" that the shooter was still present and armed to a "total stranger" who observed him "looking and acting so patently 'scared and upset' that she was moved to ask [him] whether he was 'okay'"); *Lewis*, 938 A.2d at 774-76 (affirming the trial court's discretionary decision that complainant's statement, that a man had tried to kill her, to a police officer who approached her after seeing her sitting in a car "'bleeding from the head and face area' as the result of 'multiple lacerations'" and who described her as being "'excited,' 'crying,' 'agitated,' 'very emotional,' and 'very, very upset'" was an excited utterance); *Goodwine v. United States*, 990 A.2d 965, 966-67 (D.C. 2010) (affirming the trial court's discretionary determinations that complainant's 911 call while he was being attacked and his statement to a police officer who approached him after the attack and observed that complainant had a head injury and was pacing and shaking were excited utterances); *Parker v. United States*, 249 A.3d 388, 405-06 (D.C. 2021) (affirming the trial court's discretionary determination that statements by complainant, who police observed to be "visibly injured," "shaken and agitated," "very upset," and "very worried and fearful" to a 911 operator and police after he had been "punched, kicked and hit with bottles by a large group of individuals" were excited utterances).

[18] The majority cites *Parker*, *Goodwine*, and *Teasley* for the proposition that courts have admitted "statement[s] of 'angry' declarant[s] as excited utterance[s]."

Most importantly, the cases cited by majority do not hold that the different facts in those cases *compelled* the conclusion that the statements at issue had to be admitted as excited utterances as a matter of law.[19] Thus, in this case, where we are supposed to be reviewing the trial court's ruling for abuse of discretion, none of these cases support the majority's de novo review and affirmance on other grounds.

In short, as to this essential first element of the excited utterance test, the trial court's decision to admit the 911 call based on Ms. Austin's testimony was wrong,

---

*See ante* at 22-24. But at most these cases show that a statement made while a declarant is under overwhelming stress mixed with some anger can still be an excited utterance. *See Parker*, 249 A.3d at 406 (detailing that the police spoke to the declarant after he "fled from his attackers," and police observed that he was "'shaken,' 'very upset,' and 'moving back and forth'" and when he was answering questions, described him as "'shaken' and 'angry'" as well as "'fearful' and 'unable to give an adequate account of what happened to him'"); *Teasley*, 899 A.2d at 127-29 (initially noting that anger was among the declarant's mix of emotions, but making no mention of anger when upholding the admission of the declarant's statements); *Goodwine*, 990 A.2d at 967 (observing that the declarant made the statement in question "while '[the defendant] was hitting [him]' and he was 'angry and upset'" (second alteration in original)). None of these cases support the conclusion that a showing that a declarant was angry, without more, can justify the admission of their statements as excited utterances.

[19] *See, e.g.*, *Woodfolk*, 656 A.2d at 1150-51 (holding that the trial court's discretionary decision was not clearly erroneous); *Teasley*, 899 A.2d at 127 (same); *Lewis*, 938 A.2d at 775-76 (same); *Simmons*, 945 A.2d at 1187 (holding that the trial court's discretionary decision to admit a statement as an excited utterance was not clearly erroneous while specifically acknowledging that "the judge arguably could have evaluated the facts differently and found [that the excited utterance exception did not apply]"); *Parker*, 249 A.3d at 406 (affirming on abuse of discretion review after concluding that "the trial court could [have] reasonably f[ound] that [the declarant's] powers of reflection were suspended").

as the majority effectively concedes by failing to defend the trial court's reasoning. And the majority's decision to nonetheless uphold the trial court's erroneous ruling under an abuse of discretion analysis is wrong because the majority does not and cannot take the position that the trial court's only option on this factual record was to admit Ms. Austin's statement as an excited utterance.

## C.     Totality of the Circumstances

The trial court made no effort to assess whether the "presence of circumstances . . . in their totality suggest[ed] spontaneity and sincerity of the remark[s]." *Odemns*, 901 A.2d at 776 (quoting *Nicholson*, 368 A.2d at 564); *see supra* Part I.E. *But see Mayhand*, 127 A.3d at 1211 (explaining that "all 'three elements [of the exception] must be met' before an excited utterance may be admitted" (quoting *Melendez v. United States*, 26 A.3d 234, 245 (D.C. 2011))). So here again the majority steps in for the trial court and does its own analysis instead of conducting what should be an abuse of discretion review. But, as with its analysis of the first element, the majority's analysis fails to demonstrate that the trial court's flawed ruling must be upheld as a matter of law.

To support its analysis of the third element of the excited utterance exception, the majority cursorily relies on "its analysis above . . . and the absence of evidence suggesting that Ms. Austin's statements were manufactured or insincere." *Ante* at

25. But the preceding discussion in the majority opinion focuses almost entirely on the recording of the 911 call and, to the extent the majority looks to Ms. Austin's testimony about how she felt at the time she heard gunfire, it fails to acknowledge that her admitted anger and intoxication undermine the reliability of her accusations in her statements to the 911 operator.

The majority gives short shrift to Ms. Austin's anger, even though that appears to have been her primary emotion and the reason she called 911. In a footnote elsewhere in the opinion, the majority concedes that an angry person "might be more likely to make vindictive, false accusations than a calm person," but then asserts that "anger is also probative of haste, excitement, and an inability to reflect." *Ante* at 24 n.10. The majority thus acknowledges that anger may cut in either direction, "depend[ing] on the facts of the particular case." *Id.* First, this statement seems to admit that a reasonable jurist could believe Ms. Austin's anger cut against her being in a state of nervous excitement. Second, the majority's point seems to support my own: where there is evidence that a declarant is under overwhelming stress (as was the case in *Parker*, *Teasley*, and *Goodwine*), evidence that the declarant was also angry might be consistent with a finding of nervous excitement, *see supra* note 18; but, where there is no evidence of overwhelming stress, and a declarant's primary emotion is anger, that anger cuts in the opposite direction. Third, the majority entirely ignores that one of "the facts of th[is] particular case," *ante* at 24 n.10, is

that Ms. Austin was not just angry at someone but that she angrily called 911 to inculpate them in a crime, which this court has held *must* be taken into account in any analysis of the totality of the circumstances. *See Mayhand*, 127 A.3d at 1211 ("[A]ny analysis of the totality of the circumstances must take into account [the declarant's] apparent anger at [the defendant] and his awareness that he was on the telephone, with the police, reporting a crime.").

The majority also dismisses Ms. Austin's apparent admission that in her anger, she jumped to conclusions and wrongly accused her nephew of being the person who fired the shots that she heard: Ms. Austin testified that "things shouldn't have went the way they went," that her "nephew is a good guy" and had "never done anything to harm" her, and that "I think I spoke too fast and I reacted too fast."[20] As we explained in *Pelzer*, evidence that a statement proffered as an excited utterance was inaccurate weighs *against* its admission under this exception under a totality of the circumstances analysis. 166 A.3d at 964 & n.17 (explaining that "[i]n light of th[e] rationale" for this hearsay exception, "it would be incongruous to say that emotion that induces unreliability in the proffered statement weighs in favor of that statement's admission as an excited utterance" and concluding that the fact that the

---

[20] The majority appears to read this statement as an admission, not of unreliability, but of regret for telling the truth. *See ante* at 22. But a reasonable jurist could interpret Ms. Austin's testimony as an admission that her statements were inaccurate.

911 caller admitted "he had given . . . inaccurate information" supported a determination that, under a totality of the circumstances analysis, his statements were inadmissible).

Lastly, the majority dismisses the fact that Ms. Austin said that she was high on some combination of heroin, Xanax, and methadone on the evening that she heard the gunshots.  The majority reasons that "intoxication affects only the weight [given] the[ir] [statement], not its admissibility."  *Ante* at 23 n.8 (alterations in original) (quoting *Lewis*, 938 A.2d at 776).  But *Lewis*' cursory rejection of an unpreserved argument that the proffered statement in that case should not have been admitted as an excited utterance because the declarant was "likely intoxicated" has little force here.  938 A.2d at 776.  *Lewis* simply repeated the uncontroversial statement (not specific to excited utterances or the totality of the circumstances analysis) that intoxication alone does not render a statement inadmissible.  *See id.* (stating generally that "intoxication affects only the weight of the evidence, not its admissibility").  *Lewis* did not hold that a person's admission that they were intoxicated (or, as Ms. Austin testified, high on multiple drugs) should not be taken into account at all when conducting totality of the circumstances review to assess spontaneity and sincerity under the excited utterance exception.  Such a conclusion would be remarkable, particularly given that being intoxicated or high is a well-

recognized basis for impeachment. *See (Antonio) Williams v. United States*, 642 A.2d 1317, 1320 (D.C. 1994).[21]

Accordingly, "the totality of the circumstances, like the first . . . element[] of the test for an excited utterance, do[es] not support admission of [Ms. Austin's] accusatory statements as spontaneous and non-reflective expressions of the truth" full stop, *see Mayhand*, 127 A.3d at 1211, much less as a matter of law, as it would need to for the majority to uphold the court's discretionary but deficient ruling.

\* \* \*

The trial court admitted Ms. Austin's 911 call as an excited utterance based on her testimony. But Ms. Austin's testimony clearly did not support the admission of her call under this hearsay exception. It is our job in such a circumstance to hold that the trial court abused its discretion, and the majority errs by affirming the

---

[21] Not only does Ms. Austin's intoxication make it more likely that her statements were inaccurate, but it provides an alternate explanation for some of the aspects of the 911 call that the majority identifies as unusual. *See ante* at 19 (focusing on "Ms. Austin's demeanor on the 911 call itself—specifically, her raised voice, her apparent inability to focus on the operator's questions, and her decision to terminate the call in the middle of her conversation with the operator").

admission of this call based on its substituted reasoning under the guise of abuse of discretion review.[22]

---

[22] Abuse of discretion review incorporates an assessment of harm, (*Eddie*) *Williams v. United States*, 106 A.3d 1063, 1066 (D.C. 2015) ("Part of the abuse of discretion standard includes an inquiry into whether substantial prejudice has ensued as a result of the trial court's discretionary action."), a question the majority does not reach. But the unreasonable admission of the 911 call cannot be deemed harmless on this record. *Mayhand*, 127 A.3d at 1211 & n.18 (acknowledging that, where evidence was erroneously admitted under the excited utterance exception, we may still affirm if "after pondering all that happened without stripping the erroneous action from the whole, . . . the judgment was *not* substantially swayed by the error" (emphasis and alteration in original) (quoting *Kotteakos v. United States*, 328 U.S. 750, 764-65 (1946))). The 911 call was the only direct evidence linking Mr. Austin to the shooting, and the government spotlighted the call at the beginning of its rebuttal closing argument: "'My nephew's out here shooting a gun.' You just heard that 911 call." *See Smith v. United States*, 175 A.3d 623, 631 (D.C. 2017) ("We have observed repeatedly that '[a] prosecutor's stress upon the centrality of particular evidence in closing argument tells a good deal about whether the admission of the evidence was meant to be, and was, prejudicial'" (alteration in original) (quoting *Mitchell v. United States*, 101 A.3d 1004, 1009 (D.C. 2014))). Accordingly, I would reverse on this basis.